Dewey **HART**, Appellant,

v.

Ira **M. COINER**, Warden of the West Virginia State Penitentiary, Appellee.

No. 71–1885.

United States Court of Appeals, Fourth Circuit.

Argued April 2, 1973.

Decided July 13, 1973.

Richard Vanore and Robert Wishart, Third Year Students (Barry Nakell, Chapel Hill, N. C. [Court-appointed counsel] on brief), for appellant.

Richard E. Hardison, Asst. Atty. Gen., of W. Va. (Chauncey H. Browning, Jr., Atty. Gen., of W. Va., and E. Leslie

Hoffman, III, Asst. Atty. Gen., of W. Va., on brief), for appellee.

Before BOREMAN, Senior Circuit Judge, and CRAVEN and BUTZNER, Circuit Judges.

CRAVEN, Circuit Judge:

Appellant Dewey Hart is presently confined in the West Virginia State Penitentiary under judgment and sentence that he there be imprisoned for the rest of his natural life for having violated West Virginia's recidivist statute. The life sentence, mandatory under West Virginia law, rests upon three prior convictions: (1) writing a check on insufficient funds for $50; (2) transporting across state lines forged checks in the amount of $140; and (3) perjury. Having unavailingly sought relief in the state courts, Hart thereupon prosecuted his petition for writ of habeas corpus in the United States District Court. He appeals the refusal of the district judge to grant relief. We reverse and remand with instructions. Our decision rests upon the conclusion that the West Virginia recidivist statute's mandatory life sentence is so disproportionate to the seriousness of the underlying offenses, and so grossly excessive that it amounts to cruel and unusual punishment forbidden by the eighth amendment.

In 1968 Hart was convicted of perjury in a West Virginia court as a result of testimony he gave at the murder trial of his son. Perjury carries a sentence in West Virginia of not less than one nor more than ten years. W.Va.Code § 61–5–3 (1966). Prior to sentencing on the perjury conviction, however, the state filed an information charging Hart with being an habitual offender. West Virginia's recidivist statute requires a life sentence for anyone who has been convicted three separate times of offenses "punishable by confinement in a penitentiary." W.Va.Code § 61–11–18 (1966).

The recidivist charge against Hart was based upon the perjury conviction and two prior convictions—one in 1949 for writing a check on insufficient funds for $50,[1] and one in 1955 for interstate transportation of forged checks worth $140. Hart presented no evidence to contradict the recidivist information, and, pursuant to a jury finding that he had been convicted of three offenses punishable by imprisonment in a penitentiary, the court imposed the mandatory sentence of life imprisonment.[2]

---

1. This amount is the statutory cut-off point. Had the check been in the amount of $49.99, Hart could not have been given a life sentence; passing a bad check in an amount less than $50 is punishable by confinement "in the county jail" (not a penitentiary) for not less than five nor more than 60 days. W.Va.Code § 61–3–39 (1966). Thus, instead of a life sentence, he would have been exposed to the possibility of an extra five years' imprisonment as a second offender. W.Va. Code § 61–11–18 (1966).

2. On appeal Hart also asserts that both his 1949 bad check conviction and his 1968 perjury conviction are invalid and therefore cannot be used as bases for the habitual offender charge. We disagree. There is no merit to the attack on the 1968 conviction, and we need only briefly discuss the 1949 case.

Hart contends that his 1949 conviction was illegally obtained because (1) he was denied effective assistance of counsel in that counsel was not appointed until the day he entered his guilty plea, and (2) his guilty plea was unduly coerced. There being no record of the 1949 proceeding, a full hearing on both contentions was conducted by the district judge, who denied relief.

Late appointment of counsel raises a presumption that the defendant was denied effective assistance of counsel. Stokes v. Peyton, 437 F.2d 131, 136 (4th Cir. 1970); Twiford v. Peyton, 372 F.2d 670, 673 (4th Cir. 1967). Here, however, we agree with the district judge's findings that the state effectively rebutted this presumption, Turner v. Maryland, 318 F. 2d 852, 854 (4th Cir. 1963), and that Hart's guilty plea was entered as a result of a valid plea bargain, thus insulating it from collateral attack. See Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

## I.

Initially we note that we are presented with a conviction and sentence obtained pursuant to a state statutory scheme which is valid on its face. Indeed, the Supreme Court has upheld this West Virginia habitual offender statute against due process and equal protection claims. Oyler v. Boles, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); Graham v. West Virginia, 224 U.S. 616, 32 S.Ct. 583, 56 L.Ed. 917 (1912). But we do not agree with the state's contention that these decisions foreclose Hart's present eighth amendment challenge. Hart does not attack the statute itself. He does not urge that life imprisonment per se is either cruel or unusual. Nor does he urge that the statutory scheme has been discriminatorily applied. The issue he does raise is whether the recidivist mandatory life sentence *in this case* is so excessive and disproportionate to the underlying offenses as to constitute cruel and unusual punishment. We are not precluded from deciding this issue, we think, by the fact that the West Virginia recidivist scheme is constitutional as written, for a concededly valid statute may be applied *in a particular case* in

such a way as to violate various constitutional provisions. Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) (speech and assembly); Yick Wo v. Hopkins, 118 U.S. 356, 373–374, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (equal protection). *See* Brown v. Louisiana, 383 U.S. 131, 142, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (speech and assembly).

"That the punishment is not severe, 'in the abstract,' is irrelevant; '[e]ven one day in prison would be a cruel and unusual punishment for the "crime" of having a common cold.' " Furman v. Georgia, 408 U.S. 238, 273, 92 S.Ct. 2726, 2744, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring).

We think it clear that to view the West Virginia recidivist statute with its mandatory life sentence as facially constitutional is not the end of the inquiry.

## II.

The doctrine that an excessive sentence may be invalid solely because of disproportionality is not a new one. Mr. Justice Field suggested in 1892 that the eighth amendment's prohibition [3] is di-

---

Hart testified that after counsel was appointed, the proceeding was adjourned and he was given an opportunity to discuss the pending charge with his attorney. He further testified that he admitted his guilt to his attorney, who in turn advised him that he "didn't have to plead guilty and could have a jury trial." We believe the record fully supports the district judge's denial of relief, and

the hearing which the District Court conducted ascertained in considerable detail not only what the attorney did and failed to do before trial but demonstrated beyond doubt that the accused in fact had no information to communicate to the lawyer which could have been helpful to the defense.

*Turner, supra*, 318 F.2d at 854.

There is also ample evidence in the record that Hart's plea of guilty was entered as the result of a plea bargain. In exchange for the guilty plea, the prosecutor agreed not to charge Hart with being an habitual offender, as he could properly have done on the basis of an

earlier Indiana bad check conviction. A conviction as a recidivist would have resulted in an additional five-year sentence being imposed. We think Hart's guilty plea, entered as an intelligent trial tactic, is thus insulated from attack. As the Supreme Court has stated in upholding the validity of a plea,

It may be that [the defendant], faced with a strong case against him and recognizing that his chances for acquittal were slight, preferred to plead guilty and thus limit the penalty . . . rather than to elect a jury trial
. . . .

Brady v. United States, 397 U.S. 742, 749, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970).

3. It is now settled that the ban of the eighth amendment is applicable to the states through the fourteenth amendment. Furman v. Georgia, 408 U.S. 238, 257 n. 1, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

rected not only against torture or barbarism, "but [also] against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged." O'Neil v. Vermont, 144 U.S. 323, 339, 12 S.Ct. 693, 699, 36 L.Ed. 450 (1892) (Field, J., dissenting).

In Weems v. United States, 217 U.S. 349, 367, 30 S.Ct. 544, 549, 54 L.Ed. 793 (1910), the Court adopted Mr. Justice Field's view of the eighth amendment when it stated that it is now "a precept of justice that punishment for crime should be graduated and proportioned to offense." In *Weems*, the Court noticed, with apparent approval, that the highest state court of Massachusetts had previously conceded the possibility that "punishment in the state prison for a long term of years might be so disproportionate to the offense as to constitute a cruel and unusual punishment." *Weems, supra*, at 368, 30 S.Ct. at 549; *accord*, Ralph v. Warden, 438 F.2d 786 (4th Cir. 1970).[4]

In his concurring opinion in *Furman*, Mr. Justice Douglas finds the idea of disproportionality as old as the Magna Carta: "A free man shall not be amerced for a trivial offence, except in accordance with the degree of the offence; and for a serious offence he shall be amerced according to its gravity . . . ." *Furman, supra*, 408 U.S. at 243, 92 S.Ct. at 2729.

While it seems settled that punishment must be proportioned to the offense committed, application of this principle to a particular fact situation is not without difficulty.[5] That the pro-portionality concept is not static, but is a "progressive"[6] one which "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society," enhances the difficulty. Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958).

Although the standard applicable under the eighth amendment is one "not susceptible to precise definition,"[7] there are several objective factors which are useful in determining whether the sentence in this case is constitutionally disproportionate. The test to be used is a cumulative one focusing on an analysis of the combined factors. *Furman, supra*, 408 U.S. at 282, 92 S.Ct. 2726 (Brennan, J., concurring).

■ The initial element to be analyzed in determining whether the punishment is constitutionally disproportionate is the nature of the offense itself. *Furman, supra*, at 325, 92 S.Ct. 2726 (Marshall, J., concurring). Hart's first conviction was for writing a bad check in 1949, and the second was for transporting forged checks six years later. His third conviction was more serious—committing perjury during the murder trial of his son. But even there Hart faced a moral dilemma: to choose between his duty to tell the truth and family loyalty.

In assessing the nature and gravity of an offense, courts have repeatedly emphasized the element of violence and danger to the person. *E. g.*, Snider v. Peyton, 356 F.2d 626, 627 (4th Cir. 1966); *see* Rudolph v. Alabama, 375 U. S. 889, 84 S.Ct. 155, 11 L.Ed.2d 119 (1963) (Goldberg, J., dissenting from a

---

4. Judge Butzner's opinion in *Ralph* contains an excellent compilation of authority on the doctrine of proportionality.

5. *E. g.*, Ralph v. Warden, 438 F.2d 786, 789 (4th Cir. 1970) ; *see* Packer, Making the Punishment Fit the Crime, 77 Harv.L. Rev. 1071 (1964) ; Wheeler, Toward a Theory of Limited Punishment: An Examination of the Eighth Amendment, 24 Stan.L.Rev. 838 (1972) ; Note, The Effectiveness of the Eighth Amendment: An Appraisal of Cruel and Unusual Punishment, 36 N.Y.U.L.Rev. 846 (1961).

6. The Court in *Weems* characterized the cruel and unusual punishment clause as "progressive" and "not fastened to the obsolete, but [one which] may acquire meaning as public opinion becomes enlightened by a humane justice." Weems v. United States, 217 U.S. 349, 378, 30 S.Ct. 544, 553, 54 L.Ed. 793 (1910).

7. Furman v. Georgia, 408 U.S. 238, 258, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring).

denial of certiorari).[8] In Ralph v. Warden, *supra,* 438 F.2d at 788, Judge Butzner stated that "there are rational gradations of culpability that can be made on the basis of injury to the victim." None of Hart's offenses were against the person. None involved violence or danger of violence toward persons or property. The bad check case was very nearly trivial—one penny less in the face amount of the check and the offense would have been a five-to-sixty-day petty misdemeanor.

Another factor to be examined is the legislative purpose behind the punishment.[9] *Furman, supra,* 408 U.S. at 280, 300, 92 S.Ct. 2726 (Brennan, J., concurring). The state argues that a punishment may not be cruel and unusual if it serves a valid purpose, and that the life sentence here serves such a legislative purpose—to deter other persons from future violations and to protect society from habitual criminals.[10]

Such an argument proves too much. Assuming the validity of the deterrent theory, and there is room for doubt,[11] then if a life sentence is good for the purpose, surely a death sentence would be better. Putting Hart in prison for the remainder of his life for three offenses that rank relatively low in the hierarchy of crimes would presumably prevent him from passing bad checks but would not likely make of him a truthful man. Is it a rational exercise of state police power to put a man away for life —at tremendous expense to the state— because over a 20-year period he passed or transported three bad checks and

might do it again? Life imprisonment is the penultimate punishment. Tradition, custom, and common sense reserve it for those violent persons who are dangerous to others. It is not a practical solution to petty crime in America. Aside from the proportionality principle, there aren't enough prisons in America to hold all the Harts that afflict us.

Mr. Justice Brennan has observed: "If there is a significantly less severe punishment to achieve the purposes for which the punishment is inflicted, the punishment inflicted is unnecessary and therefore excessive." [Citations omitted]. *Furman, supra,* at 279, 92 S.Ct. at 2747. We think that a sentence of life imprisonment, the most severe punishment available under West Virginia law, is unnecessary to accomplish the legislative purpose to protect society from an individual who has committed three wholly nonviolent crimes over a period of twenty years. Nor, except on the theory that more is better, is it necessary to deter others. Ten years' possible imprisonment for perjury is calculated to make one stop and think—whether or not it does.

A third objective factor is comparison of Hart's punishment with how he would have been punished in other jurisdictions.[12] Three states—Indiana, Kentucky, and Texas—provide life imprisonment as the mandatory sentence to be imposed upon the conviction of any three felonies. While Tennessee also provides for a mandatory sentence upon the third offense, two of the offenses must be specified *violent* felonies.

---

8. *See also* Packer, *supra* note 4, at 1077.

9. The fact that a West Virginia statute requires a life sentence does not establish the punishment's constitutionality in a particular case. The eighth amendment is a limitation on both legislative and judicial action. Furman v. Georgia, 408 U.S. 238, 241, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Douglas, J., concurring); Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

10. *See* Dye v. Skeen, 135 W.Va. 90, 62 S.E.2d 681, 689 (1950); State v. Stout, 116 W.Va. 398, 180 S.E. 443, 444 (1935).

11. *See* R. Donnelly, J. Goldstein, & R. Schwartz, Criminal Law 303 (1962); H. Packer, The Limits of the Criminal Sanction 39 (1968).

12. The attached survey of state statutes was prepared by Professor Barry Nakell, counsel for Hart and an instructor at the University of North Carolina Law School, and was submitted to us as part of Hart's brief on appeal.

Thus, West Virginia's recidivist scheme is among the top four in the nation in terms of severity, and may be number one.[13] Ten states make a *discretionary* life sentence available after three felony convictions. These provisions, however, provide for judicial consideration of the nature of the underlying offenses prior to imposition of the sentence, an ameliorating factor not allowed in West Virginia.

If we assume these other states treat a $50 bad check case as a felony, which is doubtful, it is theoretically possible that Hart could have been exposed to the imposition of a life sentence in 13 states besides West Virginia. But as a practical matter, we think it would certainly not occur in those ten states providing *for judicial evaluation of the underlying* offenses and the offender. Had the sentencing judge here been able to exercise discretion, it is hard to believe that he would have given Hart as much time to serve as he might give one convicted of three offenses of second-degree murder. Yet, Hart got the *maximum* without regard to the relatively petty nature of the underlying convictions.

 A comparison of punishment available in the same jurisdiction for other offenses is likewise a factor. *Weems, supra,* 217 U.S. at 381, 30 S.Ct. 544, 54 L.Ed. 793. West Virginia pro-

vides for a mandatory life sentence for only three other crimes—*first-degree murder,* W.Va.Code § 61–2–2 (1966); *rape,* W.Va.Code § 61–2–15 (1966); and *kidnapping,* W.Va.Code § 61–2–14a (1966).[14] Can it be rationally urged that Hart is as dangerous to society and as deserving of punishment as the murderer, rapist, and kidnapper?

Consideration of the penalties provided for grave crimes of violence in West Virginia reveals the irrationally disparate treatment visited upon Hart: second-degree murder, 5–18 years, W. Va.Code § 61–2–3 (1966); robbery, not less than 10 years, W.Va.Code § 61–2–12 (1966); malicious assault with intent to kill, 2–10 years, W.Va.Code 61–2–9 (1966); administering poison with intent to kill, 3–18 years, W.Va.Code § 61–2–7 (1966); first-degree arson, 2–20 years, W.Va.Code § 61–3–1 (1966); and extortion by threats of violence, and manslaughter, 1–5 years, W.Va.Code §§ 61–2–4, 61–2–13 (1966).

The repetitive commission of all of these offenses, of course, could result in punishment under the recidivist. scheme. Yet, after a second commission of these extremely violent and dangerous crimes, only five years could be added to the maximum sentence, W.Va.Code § 61–11–18 (1966). Only for the third of-

---

13. It has been noted that West Virginia's statute does not contain the word "felony." Passing a bad check in the amount of $50 is not a felony in some states. *E. g.,* N.C.Gen.Stat. § 14–107 (Supp. 1971) provides in part:

(1) If the amount of such check or draft is not over fifty dollars ($50.00), the punishment shall be by a fine not to exceed fifty dollars ($50.00) or imprisonment for not more than 30 days. Provided, however, if such person has been convicted three times of violating G.S. 14–107, he shall on the fourth and all subsequent convictions be punished in the discretion of the district or superior court as for a general misdemeanor.

(2) If the amount of such check or draft is over fifty dollars ($50.00), the punishment shall be by a fine not to exceed five hundred dollars ($500.00)

or·imprisonment for not more than six months, or both. Provided, however, if such person has been convicted three times of violating G.S. 14–107, he shall on the fourth and all subsequent convictions be punished in the discretion of the district·or superior court as for a general misdemeanor.

It is not·clear from information furnished us by counsel whether Hart's bad check offense would have triggered the recidivist law of Indiana, Kentucky, or Texas.

14. A life sentence for rape is not mandatory where the accused pleads guilty or the jury recommends mercy. W.Va.Code § 61–2–15 (1966). A life sentence for kidnapping likewise is not mandatory where the victim is returned unharmed, with or without the payment of ransom. W.Va.Code § 61–2–14a (1966).

fense could such an offender be sentenced as harshly as was Hart.

After analyzing what we believe to be the relevant criteria under the eighth amendment, we conclude that the sentence imposed upon Hart is constitutionally excessive and wholly disproportionate to the nature of the offenses he committed, and not necessary to achieve any legitimate legislative purpose.

We therefore reverse and remand with instructions that the writ of habeas corpus issue unless within a reasonable time the state chooses to resentence Hart solely on the basis of his perjury conviction.

Reversed and remanded with instructions.

APPENDIX

HABITUAL OFFENDER PROVISIONS IF
MOST RECENT CONVICTION IS PERJURY

| State | Citations | Minimum Number of Offenses | Maximum Sentence |
|---|---|---|---|
| Alabama | No habitual offender statute | | |
| Alaska | § 12.55.050 | 2d felony | Double Maximum |
| | | 3d felony | 4 times Maximum |
| | | 4th felony | Life, discretionary |
| Arizona | § 13–1649 | 2d prison offense | Not less than 10 years |
| Arkansas | § 43–2328 | 2d prison offense | Maximum |
| | | 3d prison offense | Maximum |
| | | 4th prison offense | 1.5 times Maximum |
| California | P.C., § 644 | Does not apply if perjury is the most recent offense, though perjury can be a prior | |
| Colorado | § 39–13–1 | 3d felony | Triple maximum |
| | | 4th felony | Life, mandatory |
| Connecticut | § 53a–40 | 2d felony | 10 years |
| Delaware | tit. 11, § 3911(a) | 4th felony | Life, discretionary |
| Florida | § 775.084 | 2d felony (w/15 years) | 30 years |
| Georgia | § 27–2511 | 2d prison offense | Mandatory maximum |
| | | 4th felony | Mandatory maximum without parole |
| Hawaii | No habitual offender statute | | |
| Idaho | § 19–2514 | 3d felony | 5 years to Life |
| Illinois | No habitual offender statute | | |
| Indiana | § 9–2207 | 3d felony | Mandatory life |
| Iowa | § 747.5 | 3d jail term of at least 3 years | 25 years |
| Kansas | § 21–4504 | 2d felony | Double maximum |
| | | 3d felony | Life, discretionary |
| Kentucky | § 431.190 | 2d felony | Not less than double 1st sentence |
| | | 3d felony | Life, mandatory |
| Louisiana | § 15–529.1 | 2d and 3d felonies | Double maximum |
| | | 4th felony | Life, discretionary |
| Maine | § 15–1742 | 2d prison offense | Life, discretionary |
| Maryland | No habitual offender statute | | |
| Massachusetts | § 279–25 | 3d jail term of at least 3 years | Maximum, mandatory |
| Michigan | § 28.1084 | 4th felony | Life, discretionary |
| Minnesota | § 609.155 | 2d felony | Maximum times number of priors, up to 40 years |

APPENDIX—Continued

HABITUAL OFFENDER PROVISIONS IF
MOST RECENT CONVICTION IS PERJURY—Continued

| State | Citations | Minimum Number of Offenses | Maximum Sentence |
|---|---|---|---|
| Mississippi | No habitual offender statute | | |
| Missouri | § 556.280 | 2d prison offense | Maximum, discretionary |
| Montana | § 94–4713 | 2d prison offense | Not less than 10 years |
| Nebraska | § 29–2221 | 3d offense for which prison time served | 20 years |
| Nevada | § 207.010 | 3d felony<br>4th felony | 20 years<br>Life, mandatory |
| New Hampshire | § 591:1<br>§ 651:6 | 3d felony<br>3d offense served in prison | 15 years<br>30 years |
| New Jersey | § 2A:85–12 | 4th high misdemeanor | Life, discretionary |
| New Mexico | § 40A–29–5 | 2d felony<br>3d felony<br>4th felony | Double maximum<br>Triple maximum<br>Life, mandatory |
| New York | P.C. § 70.10 | 3d felony | Life, discretionary |
| North Carolina | §§ 14–7.1 – 14–7.6 | 4th felony | Life, discretionary |
| North Dakota | §§ 12–06–18– 12–06–21 | 2d felony<br>3d felony<br>4th felony | 10 years<br>Double maximum<br>Life, discretionary |
| Ohio | § 2961.11<br><br>§ 2961.12 | 3d listed offense, including perjury and forgery<br>4th such offense | Mandatory maximum<br><br>Life, mandatory |
| Oklahoma | tit. 21, § 51 | 2d prison offense | Minimum 10 years |
| Oregon | Unavailable | | |
| Pennsylvania | tit. 18, § 5108 | 2d and 3d listed offenses, (including perjury) within 5 years<br>4th offense | Double maximum<br><br><br>Life, discretionary |
| Rhode Island | § 12–19–21 | 3d prison offense | Additional 25 years |
| South Dakota | § 22–7–1 | 2d felony<br>4th felony | Double penalty<br>Life, discretionary |
| Tennessee | § 40–2801 | 3d felony (two must be listed violent felonies) | Life, mandatory |
| Texas | P.C. Art. 62<br>P.C. Art. 63 | 2d felony<br>3d felony | Maximum<br>Life, mandatory |
| Utah | 76–1–18 | 3d felony | Not less than 15 years |
| Vermont | 13, §§ 11 and 1 | 4th felony | Life, discretionary |
| Virginia | 53–296 | 2d prison offense | Life, discretionary |
| Washington | 9.92.020 | 2d felony<br>3d felony | Life, discretionary<br>Life, mandatory |
| Wisconsin | 939.62 | 2d felony within 5 years | Additional 6 years |
| Wyoming | 6–9 | 3d felony<br>4th felony | 50 years<br>Life, Mandatory |

BOREMAN, Senior Circuit Judge (dissenting):

One of the prior convictions on which Hart's habitual offender sentence was based was a conviction on December 28, 1949, for issuing a check against insufficient funds. He was convicted upon his plea of guilty. I conclude that Hart did not have the effective assistance of counsel in connection with the entry of his guilty plea, that his 1949 conviction was invalid and that it should have been rejected as a "conviction" at his trial as a recidivist. I therefore conclude that the district court erred in denying habeas relief and on that ground alone I would reach the end result of reversal. I believe, however, that the course my brothers have chosen to follow, in basing their decision on the cruel and unusual punishment provisions of the Eighth Amendment, is not only unnecessary but also unsupportable, and I do not hesitate to indicate my disagreement therewith.

## THE 1949 CONVICTION

Hart was represented in 1949 by inexperienced counsel who was appointed for him and who had been admitted to practice in March 1949. The first time Hart met his court-appointed attorney was in the courtroom on the day he entered his guilty plea. Counsel testified at the evidentiary hearing below as a witness for the State but he did not even faintly recall having represented Hart in 1949.

Hart testified that after the appointment of counsel he and the attorney withdrew to discuss the pending charge. The attorney told him that if he did not plead guilty the prosecuting attorney would proceed against him as a second offender and thereby add five years to his sentence, but that if he did plead guilty the prosecutor would disregard any prior felony conviction.[1] He informed Hart that he did not have to plead guilty and could have a jury trial. Counsel asked Hart if he was guilty of the charge and Hart "told him that I was guilty for they had my name on the check." Hart further testified in response to a query about whether he and his attorney had discussed the facts surrounding the charge against him: "He told me they had the check against me with my name on it. And that, . . ., the Prosecutor, was going to ask for the five years former conviction. That if I would plead guilty then I would just get the one to five years." Hart stated that he and his attorney discussed nothing further with regard to the charge against him.

It is settled law in this circuit that late appointment of counsel is so inherently prejudicial as to constitute a prima facie case of denial of effective assistance of counsel. Stokes v. Peyton, 437 F.2d 131 (4 Cir. 1970); Fields v. Peyton, 375 F.2d 624 (4 Cir. 1967); Twiford v. Peyton, 372 F.2d 670 (4 Cir. 1967); Martin v. Virginia, 365 F.2d 549 (4 Cir. 1966); Jones v. Cunningham, 313 F.2d 347 (4 Cir. 1963). The burden is upon the State to introduce satisfacto-

---

1. It appears likely that Hart's memory as to his conversation with counsel was accurate in this respect. The attorney testified:

 . [I]t was a common practice for the prosecuting attorney, . . . to indicate that if a defendant wished to plead guilty who had a prior conviction, that the prior conviction would not be placed against him, although it was not an expressed condition but was certainly implied, that if a defendant stood trial and was convicted that the previous conviction would be put against him; whereas if he pleaded guilty it would not

 . . . .

 Q. Have you ever advised a defendant that a previous conviction would be used

 against him only if he stood trial and faced a jury?

 A. I may have.

 Q. On what basis would you do that?
 A. On the prosecuting attorney's representation to me that you are representing this man, that if he wants to plead guilty, we will forget his previous conviction and won't add the additional five years. If we have to go to all the bother of trying the case, and he is found guilty, why then we will put the five years onto it.

 I just repeated the message from the prosecuting attorney on different occasions.

ry evidence to overcome the presumption of prejudice arising therefrom. In holding that the State met this burden in this case the majority states that Hart "testified that he admitted his guilt to his attorney, who in turn advised him that he 'didn't have to plead guilty and could have a jury trial.'" (n. 2 Majority Opinion). The majority then approves and applies to the facts herein the statement from Turner v. Maryland, 318 F.2d 852, 854 (4 Cir. 1963), that the evidence "demonstrated beyond doubt that the accused in fact had no information to communicate to the lawyer which could have been helpful to the defense." As I read the record, however, Hart did not testify that he "admitted his guilt to his attorney," nor does the evidence demonstrate that Hart had no information which could have been helpful to his defense.

Hart testified that he told his attorney, "I was guilty for they had my name on the check." Assuming, however, as appears likely, that Hart was charged with fraudulently issuing a check upon insufficient funds under Section 61-3-39 of the West Virginia Code, such offense is far from established by the fact, standing alone, that one's name appears on the check. The elements of the offense are several and include:

(1) The drawing or delivering to another of a check;

(2) The check being drawn on insufficient funds;

(3) The check being used to obtain something of value, which was in fact obtained;

(4) With knowledge that the check is being drawn on insufficient funds;

(5) With intent to defraud; prima facie evidence of this element is established by evidence of the drawing of a check with knowledge that it is being drawn on insufficient funds, unless before in-

dictment the drawer makes restitution.

It thus appears that Hart "admitted his guilt" only as to the first element listed above; and the evidence indicates that his appointed counsel made no attempt to explain the additional elements to Hart or to investigate them in any manner. "Of course, it is not for a lawyer to fabricate defenses, but he does have an affirmative obligation to make suitable inquiry to determine whether valid ones exist." Jones v. Cunningham, *supra*, 313 F.2d 347, 353.

An additional responsibility of his attorney, since Hart was apparently entering his guilty plea to avoid prosecution as a recidivist, was to investigate the validity of the prior conviction upon which the recidivist charge would have been based. Again, it would appear from the evidence that this responsibility was not met. I believe the following language is appropriate in this case.

"We cannot acquiesce in the suggestion that because [the defendant] told his court-appointed attorney that he was guilty there was nothing else for the lawyer to do but to plead him guilty and hope for a light sentence. As we have just indicated, avenues of defense remained open, and the manifest failure to seek them out is chargeable to counsel or the lateness of the appointment, or both, not to [the defendant]." Jones v. Cunningham, *supra*, 313 F.2d at 352.

The majority's conclusion that Hart's guilty plea was "entered as an intelligent trial tactic, [and] is thus insulated from attack" is not persuasive. To characterize the "trial tactic" as "intelligent" is to beg the question here presented. If in fact Hart was not effectively counseled and represented his guilty plead was not "intelligent."

The violation of Hart's constitutional rights at the 1949 proceeding appears obvious. If the decision in this case were based thereon, it would be unneces-

sary to resort to the protection claimed by the majority to be afforded here by the provisions of the Eighth Amendment. An unseemly clash between the federal constitution and the provisions of a state statute, as applied, would thus be avoided. By proceeding as it does, I believe the majority is unnecessarily deciding an eighth amendment issue, voiding the application of a state statute unnecessarily and, in short, reaching beyond the well established bounds imposed upon the federal judiciary by principles of self-restraint, comity, and the wise exercise of discretion in the uses of judicial power. In addition thereto, assuming, which I do not, that the eighth amendment issue may properly be reached I disagree with my brothers' decision for the reasons hereinafter stated.

### THE EIGHTH AMENDMENT

As conceded by the majority, the West Virginia habitual offender statute has been upheld by the Supreme Court against due process and equal protection claims. Oyler v. Boles, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); Graham v. West Virginia, 224 U.S. 616, 32 S.Ct. 583, 56 L.Ed. 917 (1912). The majority seeks to avoid the impact of these cases on the principle that "a concededly valid statute may be applied *in a particular case* in such a way as to violate constitutional provisions." I would urge, however, that while this principle is certainly a valid one it has no application here.

The principle is well stated in Yick Wo v. Hopkins, 118 U.S. 356, 373–374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886):

"Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights,

the denial of equal justice is still within the prohibition of the constitution"

West Virginia's recidivist statute provides that anyone who has been convicted three separate times of offenses punishable by confinement in a penitentiary *shall* be sentenced to be confined in the penitentiary for life. W.Va.Code § 61–11–18 (1966). The sentence to be imposed is mandatory. There is no room for it to be "applied and administered by public authority with an evil eye and an unequal hand," nor opportunity for "unjust and illegal discriminations between persons in similar circumstances." The statute is constitutional on its face, and twice the Supreme Court has said that it is. The statutory requirement that a life sentence be imposed insures uniform application and prevents any abuse of discretion by the trial judge. The only discretion involved is that of the prosecutor in deciding whether to proceed against a particular defendant under the recidivist statute, and the conscious exercise of some selectivity in enforcement of the statute was upheld in Oyler v. Boles, *supra*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446. It appears that the majority is deciding that the state judge must decide on a case-by-case basis whether the mandatory life sentence is disproportionate and that the nature of the crimes involved in the prior convictions is properly to be considered in determining the sentence. This is precisely what the statute does not permit. By requiring such action by the state judge the statute is nullified just as certainly as if ruled unconstitutional on its face.

Assuming, without conceding, that the constitutionality of the application of the West Virginia recidivist statute may properly be considered and determined on a case-by-case basis, I do not agree that the statute was applied unconstitutionally in the instant case. In determining that Hart's sentence was disproportionate to his offenses the majority

points out that the offense in 1949 was writing a check on insufficient funds for $50.00, which is the statutory cut-off point (see fn. 1, Majority Opinion), and had the check been for one penny less, the offense could not have been used to support his recidivist conviction since the punishment therefor would not have been confinement in a penitentiary. My brothers conclude that the "bad check case was very nearly trivial." But, if $50.00 is "very nearly trivial," may not $50.01 be similarly characterized? And if $50.01 may be so described may not $200.00, $500.00, or $1,000.00? There is no end to such reasoning. There must be a cut-off point someplace and that point has been fixed by the pertinent statute. In my view, the fact that Hart's bad check in 1949 was for only $50.00, rather than more, has no proper place in considering whether he was constitutionally sentenced as an habitual offender.

The majority recognizes that courts have emphasized the element of violence and danger to the person in assessing the gravity of an offense, and states, "None of Hart's offenses were against the person. None involved violence or danger of violence toward persons or property." This is *technically* true. But Hart's perjury was committed during the trial of his son on a murder charge, one of the most serious and cold-blooded crimes, usually accompanied by violence. The majority characterizes Hart's situation as "a moral dilemma: to choose between his duty to tell the truth and family loyalty." In his perjured testimony Hart was deliberately attempting to obstruct justice and to prevent the conviction of his son on a charge of murder in the first degree. Hart's counsel might have presented an appealing argument to the jury based on "family loyalty," but it has no place in the consideration of this appeal.

I now advert to a decision this day handed down by this same panel in Wood, Appellant, v. State of South Carolina et al., Appellees, 483 F.2d 149. That appeal was from the district court's denial of habeas corpus relief to a South Carolina prisoner who was convicted on his pleas of guilty to two counts of an indictment, each count charging him with making an obscene telephone call in violation of S.C.Code Ann. § 16–552.1 (Supp.1971). Wood was sentenced to a term of five years' imprisonment on each count, the sentences to run concurrently. Under the applicable statute Wood could have been sentenced to a maximum term of ten years on each count. Until the South Carolina statute was amended in 1967, the maximum term of imprisonment for that offense was six months.

In *Wood, supra,* we were confronted with the issue as to whether the sentences imposed were so disproportionate to the offenses as to constitute cruel and unusual punishment prohibited by the Eighth Amendment. We referred to the ten-year maximum for the statutory offense as "rather startling," stated that the sentencing judge was doubtless influenced by Wood's prior criminal record which included convictions for larceny and automobile theft, but we found no disproportionality and no violation of the Eighth Amendment. I joined my brothers in affirming in that case the denial of habeas corpus relief.

So, in *Wood,* we concluded that a sentence of imprisonment for five years for making a lewd or obscene telephone call was not excessive since it was within the limits fixed by the statute. If, as suggested, the sentencing judge *may* have taken into consideration Wood's prior record of convictions for larceny and automobile theft, the record offenses were not necessarily crimes of violence and we had no information concerning the circumstances surrounding the commission of the crimes or the dollar value of the property stolen in either instance.

On the other side of the coin, in the case at bar the majority would strike

down the mandatory sentence imposed under the West Virginia recidivist statute but does not indicate any fixed formula or standard which would serve as a guide as to when and under what circumstances the mandatory life sentence is excessive, a sentence fixed by the West Virginia legislature as the penalty for repeaters or the habitual criminals who have been convicted of three separate felonies and have thus demonstrated a tendency to persist in the commission of crime. The majority simply finds it excessive here. Is it because of the "nearly trivial" bad check conviction?[2] Is it because the convictions did not involve crimes of violence? Is it because, in their wisdom, legislatures in other states may have fixed · lesser penalties for recidivists? Would a mandatory sentence of imprisonment for a specified term of years, rather than a life sentence, for a given number of felony convictions be deemed excessive and, if so, what limits would be accepted as reasonable? How about three convictions for lewd and obscene telephone calls? How many states provide a possible maximum term of ten years' imprisonment for one obscene telephone call? The questions arising are innumerable; but, to me, the majority leaves them unanswered and to be determined on a case-by-case basis. Thus, the statute is being effectively devitalized and the West Virginia state courts, charged with the duty to follow the statutory law with respect to the imposition of sentences, will be faced with a dilemma in every case of recidivism.

I think my brothers will concede that there is a paucity of authority bearing upon the Eighth Amendment and that its application to the severity of prison sentences has never definitely and conclusively been determined. I am very much disturbed when I think of the chaos which may result from this decision. With all due respect to my brothers, for whom I have the highest personal regard, I feel impelled to note my disagreement.

---

2. In our experience as practicing attorneys or, perhaps, trial judges, how many times have cases come to our attention where it was known to the prosecutor that an accused had issued a veritable flood of bad checks but the prosecutor was satisfied to accept a plea of guilty as to one and dismiss the other charges? Is this not true with reference to multiple offenses of other types and kinds such as breaking and entering, robberies, and the like? What can an appellate court possibly know of the circumstances surrounding every recorded conviction?